UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| NATIONAL FITNESS CENTER, INC., and COURT SOUTH TOTAL CONDITIONING CLUBS, LLC,<br><br>        **Plaintiffs,**<br><br><br>        **vs.**<br><br><br>ATLANTA FITNESS, INC. d/b/a CUSTOM BUILT PERSONAL FITNESS and STEPHEN DOW, individually,<br><br>        **Defendants/Counter-Claimants.** | No. 3:09-cv-133<br><br>(Campbell/Shirley) |

## ORDER

In 2006, Plaintiff National Fitness,[1] an owner of health clubs in eastern Tennessee,

entered into a Facility License Agreement (Agreement) with Defendant Custom Built,[2] a personal

training company. The parties agreed that Custom Built would provide personal training services

to health club members at the National Fitness facilities and pay a monthly license fee in

exchange for what Custom Built argues was an exclusive right to sell the personal training

---

[1]Two plaintiffs filed suit: National Fitness Center, Inc., and Court South Total Conditioning Clubs, LLC. Unless otherwise indicated, the court refers to both Plaintiffs as National Fitness.

[2]National Fitness has named two Defendants: Atlanta Fitness, Inc. d/b/a Custom Built Personal Fitness and individual Stephen Dow. Unless otherwise indicated, the court refers to Defendants collectively as "Custom Built."

sessions.  Two years later, Custom Built began withholding payment of the monthly license fees,

claiming that National Fitness had materially breached the Agreement by competing with

Custom Built.  National Fitness sued to collect the fees.

Now Custom Built moves for summary judgment on National Fitness's contract and

damages claims as well as Custom Built's counterclaims of breach of contract, tortious

interference with business relationships, and promissory fraud.[3]  For the reasons set forth below,

Custom Built's motion is GRANTED IN PART AND DENIED IN PART.

## I. FACTUAL BACKGROUND

### The Parties

National Fitness operates health clubs in the greater Knoxville area.  Before the

Agreement, National Fitness had a personal training program run by its staff of personal trainers.

National Fitness offered three different memberships: (1) the basic membership (Basic) for

$ 40.00 per month, which did not include personal training sessions; (2) the Lifestyle

membership for $ 60.00 per month, which included one non-accruing[4] personal training session

per month; and (3) the Premium Value Lifestyle (Premium) membership for $ 80.00 per month,

which included two non-accruing personal training sessions per month.  The Lifestyle and

Premium memberships lasted a fixed 36-month term, after which they were renewed monthly.

Custom Built provides personal training services but it does not own or operate health

_____

[3]Custom Built also alleges in its counterclaim that National Fitness violated the
Tennessee Consumer Protection Act and was unjustly enriched.  Because Custom Built did not
raise those claims in its Motion for Partial Summary Judgment, the court will not consider them
here.

[4]Here, "non-accruing" means that if the one session is not used during that month, it does
not carry over to the next month. It's a "use it or lose it" system.

2

club facilities. Instead, it contracts with health clubs to sell and provide personal training sessions to club members at the club facilities.

**The Facility License Agreement**

In January 2006, Stephen Dow, Custom Built's President, approached Lee Sloan, National Fitness's President, and proposed that National Fitness outsource its personal training services to Custom Built. The parties negotiated on and off through September 2006.

What happened during contract negotiations is disputed by the parties. For instance, Custom Built presents evidence that it clearly communicated the nature of its business model and contract expectations to principals of National Fitness, informing them that Custom Built expected to be the exclusive seller and provider of personal training sessions, a practice it followed with other clubs. But National Fitness has submitted evidence that Mr. Dow knew and specifically agreed that National Fitness would continue selling Lifestyle and Premium Memberships even after the Agreement went into effect.

On November 3, 2006, the parties signed the five-year Agreement. Custom Built agreed to offer and provide personal training services[5] to club members and pay a monthly license fee ranging from $42,000 to $46,000. In return, National Fitness agreed to allow Custom Built to operate its business at the health club facilities and have access to members.

**Key Language of the Agreement**

The main dispute focuses on Paragraphs 10 and 13 of the Agreement. Paragraph 10 contains an exclusivity clause:

---

[5]The Agreement defines "Personal Training" as "One-on-One or One-on-Two instruction in the proper usage of exercise equipment and physical exercise techniques[.]" (Agreement at 1.)

3

**Exclusive Rights**.  At all times during the Term, upon all terms, provisions and conditions set forth herein, Custom Built shall have the **exclusive right to sell** and perform Personal Training within the Health Clubs to Health Club Members only, and Custom Built shall be absolutely prohibited from selling and/or performing Personal Training services to non-Health Club Members and/or Health Club Members outside of the Health Clubs.  It is understood, agreed and stipulated that **[National Fitness] and all other parties are prohibited from providing Personal Training or services substantially similar thereto at the Health Clubs.**

(Id. ¶ 10 (emphases added) [hereinafter "Exclusivity Provision"].)  To address treatment of

Lifestyle and Premium members who purchased memberships before the Agreement's effective

date, the parties added a "carve-out" clause in Paragraph 13:

Existing, New and Specialty Memberships. Custom Built shall provide no more than two (2) Personal Training sessions per month to all **current** Health Club Members whose Membership Agreements with [National Fitness] include personal training provisions without charge to the Health Club Member until all outstanding sessions due the Health Club Member under the existing Membership Agreement have been provided.  Custom Built shall furthermore honor all existing contracts to Health Club Members for separate personal training services to have been provided by personal trainers and/or staff formerly under the employ of [National Fitness], at no charge to the Health Club Member and/or [National Fitness].

(Id. ¶ 13 (emphases added).)  But in the very next sentence of Paragraph 13, the parties agreed to

the following:

Additionally, Custom Built **shall provide up to five** (5) Personal Training sessions to **new** Health Club Members, who have entered into Membership Agreements with [National Fitness] **during the Term of this Agreement**, at no charge to the Health Club Member and/or [National Fitness].

(Id. (emphases added).)  The court finds that this language contradicts the apparent intention

expressed in Paragraph 10 and the earlier portion of Paragraph 13, as discussed below.

**The Contract Dispute**

In early 2008, a disagreement developed.  Custom Built contended that National Fitness

4

was acting as in-house competition to Custom Built by continuing to sell Lifestyle and Premium memberships in violation of the Exclusivity Provision of the Agreement. National Fitness responded that the Agreement and the parties' course of conduct permitted it to sell the memberships.

In November 2008, after many discussions between the parties,[6] Custom Built conditioned its payment of the license fee on National Fitness's compliance with the Agreement. Ultimately, Custom Built did not pay the facility license fees for November 2008, December 2008, or January 2009.

National Fitness points out that Custom Built paid the monthly license fees for approximately two years before questioning National Fitness's practices. Despite the fact that National Fitness continued operating the same way it always did (i.e., selling the memberships as they had been defined before the Agreement), Custom Built did not express disagreement until almost two years into the Agreement. The parties present different theories about the reason for the delay. National Fitness theorizes that the economic downturn in 2008 caused cash-flow problems for Custom Built, at which time Custom Built began to negotiate a modification of the agreement or to develop an "exit plan" by offering to sell the business to National Fitness. Custom Built asserts that it did not want to "rock the boat" with a new client but after months of trying to get National Fitness to adhere to the terms of the Agreement as Custom Built interpreted it, Custom Built refused to pay when it was not getting its benefit of the bargain. According to

---

[6]National Fitness refers to Custom Built's actions after December 1, 2006 as attempts to modify or revise the Agreement, which, in turn, indicates Custom Built's understanding that National Fitness's interpretation of the Agreement is correct. Custom Built disputes this.

5

Custom Built, it was under financial duress due National Fitness's *de facto* in-house competition with Custom Built. Custom Built says that it was unable to sell services to members who had already paid National Fitness for the same services, and, on top of that, National Fitness expected Custom Built to provide those services at no additional cost to the member of the club.

On January 5, 2009, National Fitness declared a breach by Custom Built (for failure to pay the license fees) and terminated the Agreement. Custom Built responded that it had a right to withhold the fees because National Fitness had already materially breached the contract's exclusivity provision by continuing to sell Lifestyle and Premium memberships with complimentary personal training sessions.

After the business relationship disintegrated, National Fitness hired Custom Built's entire Knoxville staff, including salespeople, managers, and personal trainers.[7] Custom Built characterizes this move as a violation of the "No Hire Policy" in Paragraph 28 of the Agreement, which dictates that, for one year after the Agreement expires, no contracting party shall "solicit, contact, call upon or communicate with any employee or independent contractor of the other party with a view to hire, employ, recruit or engage such employee or independent contractor to

---

[7]Custom Built alleges that National Fitness carried out a pre-meditated plan to poach Custom Built's employees, but the admissible evidence before the court does not support that contention. According to Custom Built, as early as April 2008, National Fitness's managers began asking Custom Built's employees whether they were satisfied with their jobs, and began making false statements about the stability of the employees' jobs and Custom Built's relationship with National Fitness. Custom Built has offered limited admissible evidence of this, focusing on one conversation in April 2008 between Lee Sloan and Rebecca Nuestadt, a National Fitness aerobics instructor at the time and later a personal trainer for Custom Built. Apparently Mr. Sloan asked Ms. Nuestadt how many aerobics classes she was teaching, whether she was happy with her job, and whether she was staying busy. Without more admissible evidence, Custom Built is not entitled to summary judgment on that issue.

6

offer, sell, provide or perform Personal Training for or on behalf of [that] party . . . ."
(Agreement ¶ 28.)

Finally, Custom Built contends that, after the business arrangement disintegrated and National Fitness officially declared a breach, National Fitness breached Paragraph 23 of the Agreement by retaining and using Custom Built's computer equipment, proprietary software (Visual Fitness Planner), and confidential information through the spring of 2009. Under Paragraph 23 of the Agreement, each party acknowledged that it "may acquire confidential information that is the exclusive and proprietary property of the other party." After defining "Confidential Information," each party agreed that it "shall not, now or at any time in the future, directly or indirectly, divulge or disclose for any purpose whatsoever any Confidential Information that has been obtained by or disclosed to such party as a result of this Agreement. Upon termination of this Agreement, each party shall return to the other party any and all documents and materials in its possession containing Confidential Information." (Agreement ¶ 23.)

The parties' competing claims are now before the court on Custom Built's Motion for Partial Summary Judgment.

## II. ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the factual evidence and draw reasonable inferences in favor of the non-moving party." National Enters., Inc. v. Smith, 114 F.3d 561, 563 (6th Cir. 1997) (citing Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). The court then

7

decides "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

## A.     Breach of Contract

Both parties have alleged breach of the Agreement. Under Tennessee state law, the essential elements of a breach of contract claim are: (1) the existence of an enforceable contract; (2) nonperformance amounting to breach; and (3) damages resulting from breach. ARC LifeMed, Inc. v. AMC-Tennessee, Inc., 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005).

Interpretation of a contract is typically a question of law for the court. Planters Gin Co. v. Federal Compress & Warehouse Co., Inc., 78 S.W.3d 885, 890 (Tenn. 2002). The court must ascertain the intent of the parties and give effect to that intention "based upon the usual, natural, and ordinary meaning of the contractual language." Id. at 889-90. The court must give "reasonable meaning to all of the provisions of the agreement, without rendering portions of it neutralized or without effect." Maggart v. Amany Realtors, Inc., 259 S.W.3d 700, 704 (Tenn. 2008). In other words, "[t]he entire written agreement must be considered" from beginning to end." Id.

If the language at issue is clear and unambiguous, "the literal meaning controls the outcome of the dispute." Id. at 703-04; also Hafeman v. Protein Discovery, Inc., 344 S.W.3d 889, 900 (Tenn. Ct. App. 2011) (same). If a contract is ambiguous, the "court applies established rules of construction to determine the parties' intent." Id.

8

A contract is ambiguous if the disputed language is susceptible to more than one reasonable interpretation. Maggart, 259 S.W.3d at 704. "'Ambiguity, however, does not arise in a contract merely because the parties may differ as to interpretations of certain of its provisions. A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one.'" Id. (quoting Johnson v. Johnson, 37 S.W.3d 892, 896 (Tenn. 2001)).

Interpretation of an ambiguous contract is a question of law "if the ambiguity exists because of the language used in the agreement and not because of extrinsic facts." Allen v. Cedar Real Estate Group, LLP, 236 F.3d 374, 381 (7th Cir. 2001). But if the ambiguity remains even after the court applies the rules of construction, the legal meaning of the contract becomes a question of fact for the jury. Planters Gin, 78 S.W.3d at 890. "[W]here the writing is not plain and unambiguous . . . and the parol evidence is conflicting or may lead to more than one conclusion, the doubtful parts may be submitted to the fact-finder for resolution." Bratton v. Bratton, 136 S.W.3d 595, 601-02 (Tenn. 2004).

### 1. Stephen Dow's Liability as a Personal Guarantor

The parties dispute whether Defendant Stephen Dow signed the Agreement not only on behalf of Custom Built, but also as an individual. Upon reviewing the Agreement's plain language, the court finds that he did sign as a personal guarantor. At the very beginning of the document, the parties agreed that:

> THIS FACILITY LICENSE AGREEMENT ("Agreement") is entered into this 3 day of November, 2006 ("Effective Date") by and between National Fitness Center, Inc. a Tennessee corporation ("NFC"), Court South Total Conditioning Clubs, Inc., a Tennessee corporation ("Court South") and Steve Dow, both individually and as President of Atlanta Fitness, d/b/a Custom Built Personal Training, a Nevada corporation ("Custom Built").

9

(Agreement at 1 (emphasis added).)  The last page of the Agreement indicates that it was signed

and executed "by the parties by their duly authorized agents," which, for Custom Built, was

"Stephen Dow, Individually & as President of Atlanta Fitness, Inc., d/b/a/ Custom Built Personal

Training."  (Id. at 8 (emphasis added).)  And in the Agreement Recitals, the parties included the

following language:

> **WHEREAS** Steve Dow, both Individually and as President of Custom
> Built, personally guarantees the performance of Custom Built and stands ready,
> willing and able to stand personally in the place of Custom Built to assure the
> performance and obligations undertaken by Custom Built[.]

(Id. at 1 (emphasis added).)  This straightforward recital, along with the clear description of

Stephen Dow signing "Individually and as President," could result in no other reasonable

conclusion than that Stephen Dow personally guaranteed performance by Custom Built.

### 2.      Ambiguity in the Agreement

Custom Built says that National Fitness breached Paragraphs 10 and 13 of the Agreement

by competing with Custom Built when it sold personal training services with Lifestyle and

Premium memberships after December 1, 2006.  (See Mem. Supp. at 12.)  National Fitness

disputes this claim.  Each party argues that the plain language of the Agreement clearly supports

its position.  But the court finds that the Agreement is ambiguous because Paragraphs 10 and 13

contain contradictory language.

The court agrees that the plain language of Paragraph 10 gives Custom Built the

"exclusive right to sell" personal training sessions:

> **Exclusive Rights**.  At all times during the Term, upon all terms, provisions and
> conditions set forth herein, **Custom Built shall have the exclusive right to sell**
> and perform Personal Training within the Health Clubs to Health Club Members
> only, and Custom Built shall be absolutely prohibited from selling and/or

10

performing Personal Training services to non-Health Club Members and/or Health Club Members outside of the Health Clubs. It is understood, agreed and stipulated that [National Fitness] and all other parties are prohibited from providing Personal Training or services substantially similar thereto at the Health Clubs.

(Agreement ¶ 10 (emphases added).) The court refers to this as the "Exclusivity Provision."

The plain meaning of the first sentence of Paragraph 10 is bolstered by the plain language at the end of the paragraph clearly stating that National Fitness is "prohibited from providing Personal Training" to health club members.

The first two sentences of Paragraph 13 are also clear and unambiguous. They address outstanding personal training sessions that National Fitness owed to existing health club members:

Custom Built shall provide no more than two (2) Personal Training sessions per month to all **current** Health Club Members whose Membership Agreements with NFC or Court South include personal training provisions without charge to the Health Club Member **until all outstanding sessions due** the Health Club Member under the **existing** Membership Agreement have been provided. Custom Built shall furthermore honor all **existing contracts** to Health Club Members for separate personal training services to have been provided by personal trainers and/or staff formerly under the employ of NFC and/or Court South, at no charge to the Health Club Member and/or NFC and Court South.

(Id. ¶ 13 (emphases added).) The court refers to this as the "Transition Provision."

Despite the parties' dispute over the meaning of "current" in the Transition Provision, the court finds no ambiguity. Custom Built interprets "current" to mean "then-in-existence" or "present." (Reply (Docket No. 32) at 7.) National Fitness says it understood "current" "to describe the [Premium and Lifestyle] Members whose dues were currently paid and were not in arrears." (Opp'n Mem. (Docket No. 31) at 15.) The court agrees with Custom Built, whose interpretation is supported by the plain language of the Agreement, especially the phrase "until

11

all <u>outstanding</u> sessions due the Health Club Member under the <u>existing</u> Membership Agreement have been provided." (Agreement ¶ 13 (emphasis added).) That interpretation is also consistent with one of the main purposes of the Agreement: to completely transfer National Fitness's personal training program to Custom Built. Logically, the first two sentences were intended to address the interim Lifestyle and Premium memberships that were issued before the personal training program was transferred to a third party. After the effective date of the Agreement, National Fitness would no longer have the ability to provide outstanding personal training sessions it had already sold to its members. To avoid breaching its agreements with Lifestyle and Premium members existing at the time of the transfer, National Fitness created a mechanism to ensure the availability of previously-sold personal training sessions. That mechanism, the Transition Provision, allowed a seamless transfer of personal training obligations to Custom Built without interrupting existing members' contracts.

The plain language of Paragraph 10 and the first two sentences of Paragraph 13, when read together, are clear and make sense. But the court cannot reconcile the last sentence of Paragraph 13 with the Exclusivity and Transition Provisions. <u>See</u> <u>Maggart</u>, 259 S.W.3d at 704 (contract must be viewed as a whole). That sentence requires that:

> Custom Built shall provide **up to five (5) Personal Training sessions** to **new** Health Club Members, <u>who have entered into Membership Agreements with [National Fitness]</u> **during the Term of this Agreement**, <u>at no charge to the Health Club Member and/or [National Fitness]</u>.

(<u>Id.</u> (emphases added).) The last sentence of Paragraph 13 suggests that National Fitness will continue to sell health club memberships which include personal training sessions even after the effective date of the Agreement. Such a right would be inconsistent with Custom Built's

exclusive right to sell personal training sessions.[8]  And such a practice would be inconsistent with the clear intent of the Transition Provision, under which Custom Built agreed to service a finite number of personal training sessions for existing members.

Essentially, the last sentence of Paragraph 13 contradicts the first two sentences of Paragraph 13.  If Custom Built is required to provide complimentary personal training sessions to new members, the Exclusivity and Transition Provisions make little sense.

Faced with irreconcilable language, the court finds that the Agreement is ambiguous and must review parol evidence to determine the intent of the parties, "including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract."  Allstate Ins. Co. v. Watson, 195 S.W.3d 609, 612 (Tenn. 2006).

Based on a review of the extrinsic evidence in the record, the court concludes that the issue of breach must go to the jury.  The evidence of the parties' intent and what occurred pre- and post-Agreement is conflicting.  For instance, the Transition Provision has little value unless National Fitness intended to change its pre-Agreement business model (which provided up to 36 sessions for Lifestyle members and up to 72 sessions for Premium members) to a business model offering "up to five" personal training sessions to new health club members (essentially creating a new type of membership or modifying the existing membership options).  Yet National Fitness

---

[8]National Fitness attempts to downplay its continued selling of Lifestyle and Premium memberships by describing its offer of personal training sessions to new members as an "amenity."  (See Dep. of Lee Sloan (Docket No. 24-5) at 63-65.)  Regardless of the word used to describe the value added to an upgraded membership (in this case, complimentary personal training sessions), National Fitness sold this "amenity" for a price above that of a general membership while still requiring Custom Built to service those sessions at no charge (i.e., National Fitness kept the money received for the added "amenity").  That is selling personal training sessions.

13

says it intended to continue, and did continue, its pre-Agreement business model, arguing that its practice was consistent with the Agreement's language and the parties' intent.

It is not at all clear from the record what the parties intended when they entered into the Agreement and when they performed under the Agreement. Accordingly, the question of breach (which depends on the disputed meaning of the Agreement) must be sorted out by a jury.

### 3. National Fitness's Demand For Liquidated Damages

In its complaint, National Fitness demands $282,340.00 in liquidated damages in addition to payment of three monthly license fees, late fees, and attorneys' fees and costs. Although the court cannot resolve the contract dispute at the summary judgment stage, the parties' dispute about National Fitness's claim for liquidated damages is ripe because Custom Built has moved the court to dismiss the claim on the basis that the liquidated damages clause is unenforceable as a matter of law.

The liquidated damages clause is found in the Agreement's Paragraph 19, titled "Remedies":

> Except as otherwise provided for herein, <u>no remedy</u> conferred by any of the specific provisions of this Agreement <u>is intended to be exclusive of any other remedy</u>. <u>Each and every remedy shall be cumulative</u> and shall be in addition to every other remedy given hereunder, now or hereafter existing at law or in equity, by statute or otherwise. <u>In the event of Default by Custom Built, [National Fitness's] remedies shall include, but not be limited to, recovery of liquidated damages in the amount of $282,340.00, based upon six (6) months' minimum License Fee Amount averaged over the Initial Term from January 1, 2007, to December 31, 2011</u>. . . .

(Agreement ¶ 19 (emphasis added).) Tennessee case law defines "liquidated damages" as "a sum stipulated and agreed upon by the parties at the time they enter their contract, to be paid to compensate for injuries should a breach occur." <u>Guiliano v. Cleo, Inc.</u>, 995 S.W.2d 88, 96-97

(Tenn. 1999) (internal quotation marks and citations omitted). "The fundamental purpose of liquidated damages is to provide a means of compensation in the event of a breach where damages would be indeterminable or otherwise difficult to prove." Id. at 98. Courts will generally enforce the provision "[i]f the liquidated sum is a reasonable prediction of potential damages and the damages are indeterminable or difficult to ascertain at the time of contract formation." Id. at 99.

But liquidated damages provisions are disfavored "when the provision serves only to penalize the defaulting party for a breach of contract." Id. at 98.

> Generally, the parties to a contract are free to agree upon liquidated damages and upon other terms that may not seem desirable or pleasant to outside observers. In that respect, courts should not interfere in that contract, but should carry out the intentions of the parties and the terms bargained for in the contract, unless those terms violate public policy.

Id. at 100 (emphasis added). Here, Custom Built contends that the liquidated damages clause in the Agreement is unenforceable as a matter of public policy because it operates as a penalty. The court agrees.

A penalty is "'a sum inserted in a contract, not as the measure of compensation for its breach, but rather as a punishment for default, or by way of security for actual damages which may be sustained by reason of nonperformance, and it involves the idea of punishment.'" Id. at 98 n.9 (quoting 22 Am. Jur. 2d Damages § 684 (1988)). The language in the provision singles out Custom Built in the event of a default. And although the liquidated damages clause purports to measure the damage National Fitness would suffer if Custom Built defaulted on the contract, the calculation is simple: the amount equals approximately six months of license fees, all of which were clearly set out in the Agreement. This is not a situation where "damages would be

15

indeterminable or otherwise difficult to prove." Id. at 98.  Indeed, the actual damages to National

Fitness are quite measurable, as National Fitness demonstrates by requesting not only liquidated

damages but also actual damages measured by the very same monthly license fees that form the

basis for the liquidated damages amount.  Moreover, the $282,340.00 does not supplant other

available remedies.  For these reasons, the court finds that the clause acts as a penalty imposed

only on Custom Built.  Accordingly, National Fitness may not recover the liquidated damages

amount even if a jury finds that Custom Built breached the Agreement.

**B.**      **Promissory Fraud**

Custom Built alleges that National Fitness never intended to perform the Agreement and

so is liable for promissory fraud.  Promissory fraud is "a type of fraud perpetuated by means of a

false promise of future action."  Shahrdar v. Global Housing, Inc., 983 S.W.2d 230, 237 (Tenn.

Ct. App. 1998).  To establish promissory fraud under Tennessee law, Custom Built must show:

(1) an intentional misrepresentation of a material fact; (2) knowledge of the falsity (the

representation may be made knowingly, without belief in its truth, or recklessly without regard to

its truth or falsity); (3) Custom Built reasonably relied on the misrepresentation to its detriment;

and (4) the misrepresentation embodied "a promise of future action without the present intention

to carry out the promise."  Stacks v. Saunders, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990).[9]

Because there are questions of fact regarding the scope of the parties' rights and

_____

[9]"Tennessee law does not require ambiguity when certain defects in the formation of the
agreement are demonstrated; parol evidence can be admitted to contradict or vary the terms or
enlarge or diminish the obligation of a written instrument upon a showing of fraud."  Shah v.
Racetrac Petroleum Co., 338 F.3d 557, 567 (6th Cir. 2003) (internal quotation marks and
citations omitted).

obligations under the Agreement, the question of present intention not to carry out the promise cannot be resolved at this point. Accordingly, the claim of promissory fraud must go to the jury.

**Tortious Interference With Business Relations**

Custom Built contends that National Fitness intentionally interfered with business relations by acting as a "*de facto*, in-house competitor to Custom Built" and implementing a scheme to steal away Custom Built's potential clients. (See Mem. Supp. at 20-21.) In particular, Custom Built contends that National Fitness's management

> [made a] conscious decision . . . to incentivize the sale of personal training with [Lifestyle and Premium] memberships. . . . [F]or at least two (2) months, [National Fitness] misled customers into believing that Custom Built's personal training services (at $60 per session) were 141% more expensive than personal training sold with [Lifestyle and Premium] members (at approximately $20 per session). When viewed together with the fact that [National Fitness] expected Custom Built to pay the License Fee *and* bear the cost of servicing all of these "free" personal training sessions sold with [National Fitness's] memberships after December 1, 2006, [National Fitness's] actions were more than improper, its actions were calculated to injure Custom Built financially.

(Id. (emphasis in original).)

To succeed on its intentional interference claim, Custom Built must establish:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's *improper motive or improper means*; and finally, (5) damages resulting from the tortious interference.

Trau-Med of Amer., Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 701 (Tenn. 2002) (emphasis in original; internal footnotes and citations omitted). Custom Built has not presented evidence of an "improper motive." And a question of fact exists regarding "improper means." Accordingly,

Custom Built is not entitled to summary judgment on this claim.

Although the "improper motive or means" element depends on the facts of the particular case, the Tennessee Supreme Court has established some parameters. A finding of "improper motive" requires "that the plaintiff demonstrate that the defendant's predominant purpose was to injure the plaintiff." Id. at 701 n.5. "Improper means" includes the following:

> means that are <u>illegal or independently tortious, such as</u> violations of statutes, regulations, or recognized common-law rules; violence, threats of intimidation, bribery, unfounded litigation, <u>fraud, misrepresentation or deceit</u>, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship; and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition.

Id. (internal citations omitted; emphasis added). "Improper motive" and "improper means" are alternative theories, and Custom Built only needs to establish one or the other to satisfy the fourth element of the tort.

The evidence in the record does not establish an improper motive. Under Tennessee law, to establish improper motive, Custom Built is required to demonstrate that National Fitness's "predominant purpose was to injure" Custom Built. Trau-Med, 71 S.W.3d at 701 n.5. According to Custom Built, National Fitness's improper motive is shown by the following facts: (1) continuing to sell higher-priced memberships that included personal training sessions, (2) keeping the money from those higher-priced memberships, (3) taking the license fees from Custom Built, and (4) requiring Custom Built to provide the sessions for free. All this shows, however, is that National Fitness was motivated by a desire to benefit itself financially, with the indirect effect of damaging Custom Built financially.

As for improper means, showing breach of the Agreement by itself is not enough. "A

18

deliberate breach of contract, even where employed to secure economic advantage, is not, by itself, an 'improper means.'" Leigh Furniture & Carpet Co. v. Isom, 657 P.2d 293, 309 (Utah 1982), cited in Trau-Med, 71 S.W.3d at 701 n.5 (discussing examples of improper means). However, a breach of contract committed for the immediate purpose of injuring the other party—that is, "to achieve a larger advantage by injuring the plaintiff in a manner not compensable merely by contract damages"—does satisfy that element of the tort. Id. Nevertheless, even assuming that National Fitness breached the Agreement, there is no evidence here that it did so to gain anything other than an economic advantage.

The only evidence in the record that potentially falls into the "improper means" category is evidence of promissory fraud. See Trau-Med, 71 S.W.3d at 701 n.5 (noting that "fraud, misrepresentation or deceit" could qualify as an improper means). Accordingly, Custom Built's intentional interference claim depends on proof of intent to commit fraud. As noted above, there is a question of fact about whether National Fitness entered into the Agreement with the intention never to perform its contractual obligations. With unresolved questions of material fact remaining on the promissory fraud claim, Custom Built is not entitled to summary judgment on its claim of intentional interference with business relations.

D.      **Custom Built's Request for Punitive Damages**

Custom Built asserts that National Fitness is liable for punitive damages based on the following sets of acts:

> **[First**, National Fitness] acted intentionally by unlawfully poaching Custom Built's workforce; impermissibly keeping and using Custom Built's confidential and proprietary information to Custom Built's detriment; and knowingly acting as a *de facto*, in-house competitor to Custom Built in violation of the Agreement's plain terms. **[Second**, National Fitness] acted fraudulently by entering into the

Agreement with Custom Built with the foreknowledge that [National Fitness] had no intention of honoring the Agreement at the time of the Agreement's signing. **[Third**, National Fitness] acted maliciously by (a) entering into a Partial Settlement with Custom Built, then suing Custom Built even after [Custom Built] had turned over its entire Knoxville draft [list of clients] worth $266,000; and (b) maintaining its claim for punitive damages against Custom Built even after being provided Tennessee case law describing why punitive damages in this case were prohibited, and despite being given an opportunity to retract its claim for punitive damages from its Complaint.

(Mem. Supp. at 23-24.) Although the court is sending the issue of liability to a jury for resolution, the validity of Custom Built's punitive damages claim is ripe for decision.

In general, punitive damages may be awarded if the party shows "fraud, malice, gross negligence, oppression, evil motives, conscious indifference, and reckless conduct implying 'disregard of social obligations.'" Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 900-01 (Tenn. 1992) (quoting Inland Container Corp. v. March, 529 S.W.2d 43, 45 (Tenn. 1975)).

The first basis for Custom Built's claim of punitive damages amounts to a claim that National Fitness breached the Agreement. That is not a proper basis for award of punitive damages. Punitive damages are not generally available in breach of contract cases. B.F. Myers & Son of Goodlettsville, Inc. v. Evans, 612 S.W.2d 912, 916 (Tenn. Ct. App. 1980).

The second basis for Custom Built's punitive damages claim mirrors its promissory fraud claim, on which Custom Built is not entitled to summary judgment. More importantly, National Fitness's actions does not rise to the level of behavior that would warrant an award of punitive damages in the event a jury finds in favor of Custom Built.

The third basis for Custom Built's claim is either outside the scope of Custom Built's counterclaim or relates to litigation stances taken by National Fitness. If Custom Built seeks a sanction from National Fitness for litigation stances, such a claim must be addressed under the

20

Federal Rules of Civil Procedure and is not before the court.

Overall, Custom Built does not point to any behavior that is so extreme that it falls within the category of actions that warrant punitive damages. For the foregoing reasons, the court declines to submit the issue of punitive damages to the jury.

### III. CONCLUSION

For the reasons set forth, the Motion for Summary Judgment and Partial Summary Judgment filed by Atlanta Fitness, Inc. d/b/a Custom Built Personal Fitness and Stephen Dow is GRANTED IN PART AND DENIED IN PART, as follows:

1.      The liquidated damages provision in the Agreement is not enforceable because it operates as a penalty;

2.      Stephen Dow signed the Agreement not only on behalf of Custom Built but as a personal guarantor;

3.      Genuine disputes of material fact exist concerning National Fitness's contract claim and Custom Built's contract, intentional interference, and promissory fraud claims. Accordingly, Custom Built is not entitled to summary judgment; and

4.      Custom Built will not be allowed to submit a punitive damages claim to the jury.

SO ORDERED this 9th day of October, 2012.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge